UNITED STATES OF AMERICA
DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

JW
by his next friend Maryellen Wright
and MARYELLEN WRIGHT

         Plaintiffs                                  Case No.

v                                                        Hon.

MAYVILLE COMMUNITY SCHOOLS
and MARTIN BLACKMER

         Defendants

Attorneys for Plaintiffs:
Nicholas Roumel (P37056)
Edward Macey (P72939)
**NACHT, ROUMEL, SALVATORE,**
**BLANCHARD & WALKER, P.C.**
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
nroumel@nachtlaw.com
emacey@nachtlaw.com

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiffs state their complaint as follows:

### Preliminary Statement

Defendants repeatedly assaulted the 9 year old disabled JW, and on each occasion imprisoned him in a small, padded seclusion room. Such actions were unjustified and illegal. Through his next friend, his mother, the child brings a claim for disability discrimination, deprivation of his constitutional rights, assault and battery, and false imprisonment.

**Parties/Jurisdiction/Venue**

1.      JW is ten years old, born October 28, 2003.  He has four siblings.  He is a resident of Tuscola County, Michigan.

2.      Maryellen Wright is a Resident of Tuscola County, Michigan and is JW's mother.

3.      Defendant Mayville Community Schools ["Mayville"] is a Michigan public school district pursuant to the School Code of 1976, MCL 380.1 et seq., with principal offices at 6250 Fulton Street, Mayville, Tuscola County, Michigan, 48744-9103. Its present superintendent is Ms. Rhonda Blackburn.

4.      The school district covers 11 square miles. It is a rural community located in the "Thumb" of Michigan. The closest metropolitan area is Saginaw. Enrollment for the present school year is approximately 735 students (K-12).

5.      Defendant Martin Blackmer was, at all times relevant, the principal of Mayville Elementary School.

6.      The events that are the basis for this lawsuit took place in Mayville.

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, 1343 (a)(3), 1343(a)(4), 2201 and 2202; 42 U.S.C. §12101 et seq. ["ADA"], Section 504 of the Rehabilitation Act of 1973 [29 U.S.C. §794(a)], 42 United States Code ["USC"] section 1983, and pendent jurisdiction under the Michigan Persons with Disability Civil Rights Act [MCL §37.1101, et seq.; MPWDCRA], and common law.

8.      Exhaustion of administrative remedies is not required and/or futile under the unique circumstances of this case. JW's injuries cannot be redressed by resort to

administrative due process procedures available for his special education status, and he seeks only monetary damages to compensate him for the assault causing her injuries.

9.      The amount in controversy exceeds $75,000.00.

**Factual Allegations**

10.     Previous paragraphs adopted by reference.

11.     For most of his life, JW has suffered from complex partial seizures. JW describes these seizures as "a fire in [his] belly" that works its way up into his chest and throat.  At the onset of these seizures, JW simply says, "I have a bad feeling."  Some are referred to as "staring" seizures. During more severe seizures, JW's speech is slowed; his facial muscles will droop; he staggers and sometimes rocks back and forth; he repeatedly swallows and smacks his lips; and his head consistently turns to the right. He usually complains of a headache afterwards; he is also sometimes sleepy. The seizures generally last for about 45 seconds.

12.     JW briefly attended Kingston Elementary School (in a different district, Kingston Community Schools) during the prior 2008-2009 school year, but subsequently disenrolled from there and instead enrolled in Mayville's Head Start program.

13.     Since enrolling in Mayville, JW has been a special education student receiving services pursuant to Section 504 of the Rehabilitation Act and Individuals with Disabilities Education Act (IDEA), including Individualized Education Programs (IEP's).

14.     In September, 2009, JW resumed kindergarten, this time at Mayville Elementary School.

15.     On only his second day of kindergarten (September 9, 2009), JW had his first incident with the school's principal, defendant Martin Blackmer. Blackmer

physically removed JW from the classroom, and when JW resisted, the incident escalated. JW was suspended for three days as a result.

16.     After the incident, Blackmer called Kingston Elementary to inquire about JW's history there as a kindergartener, including his medical information.

17.     Previously when he was at Kingston, JW had his first Individualized Education Plan ["IEP'], pursuant to his eligibility as a disabled student eligible for special education services, on or about November 21, 2008.

18.     After re-enrolling at Mayville, JW underwent an updated IEP evaluation, on September 24, 2009. It was determined that he had a significant gross motor impairment that interfered with his participation in physical education, recess, and mobility in school. His evaluation listed the following as appropriate supplementary aids/services/supports: "regular contacts with mom, choices, reinforcement, (unintelligible handwriting), vertical writing on the wall, attend to correct behavior & LQA for wrong behavior" in his general education class. Ancillary services included 60 minutes per month of physical therapy in the special education classroom and 60 minutes per month of social services work ["SSW"].

19.     On October 15, 2009, an Emergency Intervention Plan was developed for JW. This document stated that only if JW engaged in certain behaviors, such "throwing objects, eloping – anger-based physical, hitting, pinching,"  then certain "emergency seclusion or restraint" could be used such as "transport physical escort; thinking chair (spot), choice, thinking room, open door, door closed." The thinking room was described as a quiet, calm place. The plan also cautioned that there were potential medical contraindications with a heart/seizure condition that JW "may have."

20.     JW's mother, Maryellen Wright, consented to this Emergency Intervention Plan, with the understanding that she was able to withdraw her consent at any time "upon notification to the appropriate…administrative staff" at the TISD (Tuscola Intermediate School District).

21.     During the general time period 2009-2011, JW has been diagnosed with a seizure disorder, asthma, ADHD; and, in March, 2011, by the Mayo Clinic in Rochester, Minnesota with epilepsy and fatigable weakness.

22.     JW's mother provided her son's medical records either directly or indirectly (via authorization forms) to the defendants with each diagnosis.

23.     JW's disabilities often present themselves in the form of behavioral problems.

24.     Mayville has shown a significant failure to accommodate for his disabilities and to address these behavior problems in a manner proportional to JW's actions, which can be distracting but are not harmful to others.

25.     Mayville's administrators, chiefly defendant Blackmer, have expressed skepticism that JW's behavior problems stem from his disabilities, and instead have expressed that they are caused by a lack of discipline by his mother, Ms. Wright, and have more than once accused her of "babying" JW.

26.     On November 23, 2010, JW had a new IEP conducted.  JW was evaluated as "reportedly diagnosed with ADHD" in the Social/Emotional/Behavior category and assigned team meetings and leader support as the supplemental service provided for this disability. He was once again evaluated as having a significant gross motor impairment.

His SSW support was listed on an "as needed" basis, instead of assigned as 60 minutes per month.

27.     On January 27, 2011, Brenda Danielsen, a Head Start Family Coordinator, observed a 5-year-old child (not JW) get locked in the thinking room unsupervised for an unsubstantiated and lengthy amount of time. Ms. Danielsen reported the incident and use of the "thinking room" to Child Protective Services.

28.     The "thinking room," also known as the "stress reduction room," is a tiny, 5' x 6' closet-like room, with padding on three of the four walls, and a door with no handle on the inside. There are no windows except for a tiny rectangle window at the top of the door, which would be too tall for any child to see out of. There is no furniture in the room, so the children are forced to sit on the floor. Children are left completely unattended and unsupervised while they are within the room. Before being allowed to exit the room, the children are forced to complete certain "compliant tasks" which include jumping up and down on one foot and rubbing their head.

29.     In February, 2011, Ms. Danielsen emailed Mr. Blackmer to express her concerns about his use of the thinking room and whether or not a room like this is even appropriate. Mr. Blackmer responded that he has to follow the TISD's behavior plan.

30.     On April 13, 2011, JW was placed in thinking room because, according to a report prepared by defendant, he "didn't want to be with teacher during special time."

31.     On Friday, May 6, 2011, Ms. Wright confronted Mr. Blackmer about his treatment of JW and his use of the thinking room.  Blackmer told Ms. Wright to stop "babying" JW at home. Ms. Wright stated, "I have never seen JW show explosive-violent behavior at home. You just have to deal with JW differently than with other children,

because his behavior reflects the attitude shown by the person disciplining him." Blackmer responded, "Keep babying him at home but I am not doing it here."

32.     The very next school day, on Monday, May 9, 2011, JW was put in the thinking room by Mr. Blackmer for nearly three hours as part of an in-school suspension. A teacher who witnessed this characterized Blackmer as "dragging" JW down the hallway.

33.     On May 24, 2011, Ms. Wright met with Mr. Blackmer and other administrators with regard to JW's IEP and behavior plan.  She told them in no uncertain terms that JW was not to be put in the "thinking room" ever again and that she wants it taken off of his intervention plan. It was done as she instructed.

34.     On Friday, September 30, 2011, Ms. Wright requested a copy of JW's school records. A few hours later, she received a call to pick up JW from school. Ms. Wright saw JW's teacher, Ms. Rayl, who released JW and gave Ms. Wright JW's assignments. No reason was given and Ms. Rayl said nothing about a physical altercation.

35.     On Monday, October 3, 2011, Ms. Wright went to the school to talk with the school's crisis intervention aide to discuss JW's issues in the classroom. She kept JW home from school that day because he was not feeling well. Mr. Blackmer approached Ms. Wright and said that JW was suspended from school for three days due a physical altercation with his teacher. After discussion, he reduced it to a two-day suspension and sent a letter confirming this. On information and belief, he reduced the suspension because Wednesday, October 5, 2011 was a state "count day" that directly related the school's funding to the number of students actually present that day.

36.     After the discussion with Mr. Blackmer, Ms. Wright went to see the Superintendent, Rhonda Blackburn. She stated her belief that JW was being retaliated against for her advocacy on his behalf, and brought up her concerns about JW's safety at school, citing the May 9, 2011 incident with JW being in the thinking room unaccounted for almost three hours.

37.     They also discussed JW's IEP. Ms. Blackburn said they did not have to follow it because they did not have his medical records regarding epilepsy. Ms. Wright went home and retrieved them and brought them back to school to personally deliver them to Ms. Blackburn.

38.     On October 20, 2011, Ms. Wright met with Mr. Blackmer and other administrators for a meeting about JW's behavior plan. She asked them not to retaliate against JW due to her making complaints at the meeting. She noticed that they were "very mad."

39.     The very next day, on October 21, 2011, another assault and imprisonment took place. On that day, Mr. Blackmer noticed JW allegedly misbehaving in class from outside the classroom, and chose to intervene.

40.     JW was simply playing with a pencil, as he later described it, pushing the point into a glue stick. Defendants claim he also threw some crayons.

41.     For this behavior, against JW's will, Mr. Blackmer physically picked up and carried JW to the "thinking room."

42.     Mr. Blackmer forcibly threw JW into the "thinking room" and shut the door. JW was in there for hours, causing him great distress.

43.    At one point, Mr. Blackmer attempted to force JW to complete "compliant tasks" but JW refused, and Blackmer left him in the room longer.

44.    The school secretary phoned Ms. Wright to have her pick up her son and take him home.

45.    At some point after Ms. Wright had arrived, Mr. Blackmer opened the door and JW stuck his foot in the opening, in an apparent attempt to exit. During this episode, JW's shoe somehow flew off into the hallway.

46.    What occurred next was witnessed by Ms. Wright and her neighbor, Lisa Wood. Mr. Blackmer was forcibly closing the door on her son's legs, compressing them between the wall and the force of Mr. Blackmer's weight.

47.    Ms. Wright took both JW and her daughter, DW, away from the school that day and did not allow them to return, fearing for their safety.

48.    Immediately after leaving, Ms. Wright brought JW to the TISD to report the incident. She then took him to Lapeer Hospital, where he was evaluated and released with contusions and bruising which ranged from mild to moderate. The injury was mainly on his legs and ankles, but it also appeared on his arms from where he had been grabbed by Mr. Blackmer.  Photographs of his bruises were taken.

49.    The hospital staff called the police because of the bruising. A lengthy investigation was conducted. JW was interviewed by police on February 13, 2012. The officer noted that JW was "outgoing and cheerful." When the officer asked JW "what he wished would happen in reference to this compliant, he just stated that he "didn't want to get Mr. Blackmer in trouble."" On information and belief, the investigation remains pending.

50.     On October 24, 2011, Ms. Blackburn called Ms. Wright to ask why both her children were not in school. Ms. Wright told her about what had happened on the 21st.

51.     On October 27, 2011, Ms. Wright followed up on the phone call by sending Superintendent Blackburn a letter asking what options could be provided to ensure that JW and DW be given a safe and appropriate education, and further requested documents relevant to her son's education and the incident. Ms. Blackburn responded on October 28, 2011 with a request for an in-person meeting.

52.     A meeting took place on November 2, 2011, with Ms. Wright, her husband, Ms. Blackburn, an advocate for JW referred by the TISD. They discussed the incident on October 21. Ms. Blackburn defended Blackmer's actions and further discussed educational options for JW.

53.     On November 7, 2011, Ms. Blackburn also mailed a letter in response to Ms. Wright's request for documents, and asked for a second meeting. She further asked JW's family to provide a formal written complaint so that the district may investigate the incident.

54.     On December 15, 2011, Ms. Wright complied by providing a formal written request for investigation, outlining her concerns about the October 21, 2011 incident.

55.     In response, on December 28, 2011, Ms. Blackburn sent a letter with the outcome of the investigation. She wrote that "at no time was JW's foot trapped in the door." She further found Mr. Blackmer was acting appropriately, as JW had been disruptive in the classroom.  However, Ms. Blackburn informed Ms. Wright that Mr.

Blackmer agreed not to interact with JW in the future, and asked that JW come back to school beginning January 3, 2012.

56.    Ms. Blackburn came to this conclusion despite the apparent violation of the Michigan Department of Education's Guidelines on Seclusion and Restraint, found at: http://www.michigan.gov/documents/mde/Seclusion_and_Restraint_Standards_180715_7.pdf, which state in relevant part:

57.    "Seclusion is a last resort emergency safety intervention that provides an opportunity for the student to regain self-control. Seclusion is the confinement of a student in a room or other space from which the student is physically prevented from leaving and which provides for continuous adult observation of the student. A room or area used for seclusion:

    I.    must not be locked;

    II.    must not prevent the student from exiting the area should staff become incapacitated or leave that area; and

    III.    must provide for adequate space, lighting, ventilation, viewing, and the safety of the student.

58.    Similarly, "Restraint is a last resort emergency safety intervention. Restraint is an opportunity for the student to regain self-control." "Emergency restraint" is limited to "emergency situations and if essential. An emergency that may require the use of restraint includes behavior that:

    I.    poses an imminent risk to the safety of an individual student;

    II.    poses an imminent risk to the safety of others; or

III.    is otherwise governed by The Revised School Code, 1976 PA 451, otherwise known as the Corporal Punishment Act.

59.    The Guidelines further state that neither restraint nor seclusion shall be used:

I.    for the convenience of staff;

II.    as a substitute for an educational program;

III.    as a form of discipline/punishment;

IV.    as a substitute for less restrictive alternatives;

V.    as a substitute for adequate staffing; or

VI.    as a substitute for staff training in positive behavior supports and crisis prevention and intervention.

60.    Ms. Wright refused to return her children to the school where despite these guidelines, and in defiance of common sense, the Superintendent had found that Mr. Blackmer had acted appropriately in restraining, imprisoning, and assaulting her son.

61.    After it was apparent that the children were not returning to school on January 3, 2012, on January 26, 2012, Ms. Blackburn sent a letter to Ms. Wright informing them that if the children were not in school or being home-schooled, she would have no choice but to report them to the Tuscola Truancy Officer and Michigan Department of Human Services.

62.    Ms. Wright did not return JW to Mayville; JW is now homeschooled.

63.    Defendants' actions have damaged JW as described herein and below.

## **Legal Allegations**

*Count I – Americans with Disabilities Act (ADA) – Discrimination (defendant Mayville)*

64.   Previous paragraphs adopted by reference.

65.   Defendant is a public entity within the meaning of 42 USC 12131(1).

66.   JW's various diagnoses qualifies him as a person with an actual disability for purposes of the ADA in that these conditions substantially limit one or more major life activities.  42 USC 12102(2).

67.   As a qualified individual, and as a special education student receiving services pursuant to Section 504 of the Rehabilitation Act and Individuals with Disabilities Education Act (IDEA), JW meets the essential eligibility requirements for participation in the programs or activities provided by Mayville. He meets these requirements with or without reasonable modifications to the rules, policies, or practices of defendant.  42 USC 12131(2).

68.   Despite the fact that he is a qualified individual, JW has been denied, by reason of his disability, the benefits of, or participation in, the services provided.

69.   Defendant's actions constituted discrimination in violation of the ADA. 42 USC 12132.

70.   Defendant's discrimination has directly and proximately caused JW great damages, as set forth herein and below.

*Count II – Americans with Disabilities Act (ADA) – Failure to Accommodate (defendant Mayville)*

71.   Previous paragraphs adopted by reference.

72.   Defendant was adequately informed of JW's disabilities.

73.   Defendant had the means to accommodate JW's disabilities and such accommodations would not have imposed an undue hardship to Defendant.

74.   Defendant failed to reasonably accommodate JW.

75.   Such failure to accommodate has directly and proximately caused JW great damages, as set forth herein and below.

*Count III –Persons with Disability Civil Rights Act – PDCRA – Discrimination (defendant Mayville)*

76.   Previous paragraphs adopted by reference.

77.   JW's various diagnoses qualifies him as a person with an actual disability for purposes of the Michigan Persons with Disability Civil Rights Act (PDCRA) in that these conditions substantially limit one or more major life activities.  MCL 37.1103.

78.   JW qualified for the educational opportunity that he sought despite the disability.

79.   In spite of these qualifications, JW has not been given an equal opportunity to secure a similar education as other persons.

80.   Defendant's discrimination has directly and proximately caused JW great damages as described herein and below.

*Count IV – Persons with Disability Civil Rights Act – PDCRA – Failure to Accommodate (defendant Mayville)*

81.   Previous paragraphs adopted by reference.

82.   Defendant was adequately informed of JW's disabilities.

83.   Defendant had the means to accommodate JW's disabilities.

84.   Such accommodations would not have imposed an undue hardship to Defendant.

85.   Defendant failed to reasonably accommodate JW.

86.   Such failure to accommodate has directly and proximately caused JW great damages, as set forth herein and below.

*Count V – Section 504 of the Rehabilitative Act – Discrimination (defendant Mayville)*

87.   Previous paragraphs adopted by reference.

88.   JW's various diagnoses qualify him as a person with an actual disability for purposes of Section 504 of the Rehabilitative Act of 1973 (Section 504) in that these conditions substantially limit one or more major life activities. 34 CFR 104.3(j)(1)(i)

89.   JW qualified for the educational opportunity that he sought despite the disabilities.

90.   Although qualified, JW was not given an equal opportunity to secure a similar education as other, non-disabled persons.

91.   He was denied those services and educational opportunity solely by reason of his disability.

92.   JW suffers from injuries as a result of his educational deprivations that cannot be addressed by any amount of compensatory education.

93.   Defendant has acted in bad faith or with gross misjudgment.

94.   Defendant's discrimination has directly and proximately caused JW great damages as described herein and below.

*Count VI – Section 504 of the Rehabilitative Act – Failure to Accommodate (defendant Mayville)*

95.   Previous paragraphs adopted by reference.

96.   Defendant was adequately informed of JW's disabilities.

97. Defendant had the means to accommodate JW's disabilities.

98. Such accommodations would not have imposed an undue hardship to Defendant.

99. Defendant failed to reasonably accommodate JW.

100. Such failure to accommodate has directly and proximately caused JW great damages, as set forth herein and below.

<u>*Count VII – 42 USC 1983 – enforcement of constitutional rights (both defendants)*</u>

101. Previous paragraphs adopted by reference.

102. Plaintiff JW has a fundamental constitutional right to person security and bodily integrity. *Ingraham v. Wright,* 430 US 651 (1977).

*103.* JW also has a fundamental constitutional right to be free from unreasonable seizures. *4th Amendment to the U.S. Constitution.*

104. Those rights were violated by the clear and persistent pattern of abuse perpetrated by defendants against JW.

105. Defendants, at all relevant times, were on notice that Ms. Wright did not tolerate the abuse against her son, by way of her statements at meetings, in one on one communications, letters, and other communications, including her clear withdrawal of consent for the use of the "thinking room" as a behavioral intervention against her son.

106. Nonetheless, Mayville did nothing to prevent or stop the abuse, and tacitly approved it, as evidenced by Mr. Blackmer's continuation and even escalation of abuse against JW, and the Superintendent's express approval of his actions as evidenced by her various communications with Ms. Wright, and ultimate finding of no wrongdoing.

107. As such, there was an official policy of inaction by the school district in contravention of JW's constitutional rights.

108. That policy or custom resulted in deprivation of JW's constitutional rights, including but not limited to defendant Blackmer's actions on April 13, 2011, May 9, 2011, and October 21, 2011.

109. The use of the thinking room was not limited to JW or isolated instances; indeed, it was a widespread, prevalent, and accepted practice at Mayville, as evidenced by the use of the thinking room solely for the purpose of forceful seclusion as a form of discipline, despite complaints by Ms. Wright and others.

110. At all relevant times, defendants acted under color of state law, using the power of their position, title and authority, to deprive JW of his constitutional rights.

111. Blackmer is not immune from suit, on the basis of either absolute or qualified immunity, because in light of his statements and actions, and MDE guidelines forbidding such restraint and seclusion:

    I.    His actions in physically assaulting, restraining, and imprisoning JW were not performance of a governmental function;

    II.    His actions could not reasonably be construed as either disciplinary in nature, or permissible corporal punishment;

    III.    His actions were arguably in retaliation for complaints that Ms. Wright made against him on May 8, 2011, the day before the May 9, 2011 incident; and on October 20, 2011, the day before the October 21, 2011 incident;

IV.     He was not acting within the scope of his authority, nor could he have reasonably believed that he was so acting;

V.     His actions were not legally authorized, nor could he have reasonably believed they were.

112. Defendant's deprivation of JW's constitutional rights has caused him considerable damages, and entitles him to specific relief, as stated herein and below.

*Count VIII – Assault and Battery (defendant Blackmer)*

113.  Previous paragraphs adopted by reference.

114.  Blackmer's actions, including but not necessarily limited to those on April 13, 2011, May 9, 2011, and October 21, 2011, constituted a willful and intentional assault and battery against JW.

115.  Blackmer was acting under color of state law, and not immune from suit, as set forth in more detail above.

116.  These assaults on JW damaged him as stated herein and below.

*Count IX – False Imprisonment (defendant Blackmer)*

117.  Previous paragraphs adopted by reference.

118.  On several occasions, including but not limited to April 13, 2011, May 9, 2011, and October 21, 2011, Defendant Blackmer restrained JW's personal liberty or freedom of movement, by physically carrying him, as described in more detail above.

119.  Blackmer further confined JW by forcibly placing him into the "thinking room," as described in more detail above.

120. These restraints and detentions deprived JW of his personal liberty or freedom of movement

121.  Such restraint and detention was against JW's will.

122.  Such restraint and detention was intentional, and unlawful.

123.  Blackmer was acting under color of state law, and not immune from suit, as set forth in more detail above.

124.  His false imprisonment of JW damaged him as stated herein and below

### *Count X - Gross Negligence*

125.  Previous Paragraphs adopted by reference.

126.  Defendants were responsible for protecting JW from abuse at schools, including his false imprisonment and assaults by Blackmer.

127.  Defendants had sufficient knowledge of Blackmer's propensity to assault and falsely imprison students under his official supervision. This knowledge came from specific prior notice, including but not limited to Brenda Danielsen's January 2011 complaint to CPS, her February 2011 complaint to Blackmer, Ms. Wright's complaint to Blackmer on May 6, 2011 about Blackmer placing her son JW in the thinking room in April 2011, her specific instruction on May 24, 2011 that JW was no longer to be placed in the thinking room, and her specific instruction to Defendants to remove that potential consequence from JW's intervention plan

128.  Despite this notice and knowledge, Defendants continued to place JW in the thinking room on at least three occasions after the first time they received notice from Danielsen's complaints in January and February 2011.

129. The failure of the Defendants to take action to avert the foreseeable, specific risk of harm to JW, by continually placing him in the thinking room, and

permitting his assault, false imprisonment, and otherwise damaging him as described in this complaint was grossly negligent.

130.  Defendants' failure to act, which directly and proximately caused JW's injuries, was so reckless that it demonstrated a substantial lack of concern for JW's safety, security, and well-being

### *Count XI – Negligent Infliction of Emotional Distress (by Maryellen Wright against defendant Blackmer*

131.  Previous Paragraphs adopted by reference.

132.  Plaintiff Maryellen Wright witnessed Defendant Blackmer assault her son, JW, by slamming his foot and leg into the door of the "Thinking Room."

133.  Defendant Blackmer's conduct constitutes, at a minimum, gross negligence.

134.  Plaintiff JW was seriously injured and hospitalized as a result.

135.  Ms. Wright was shocked by witnessing it, suffering physical harm, including anxiety and sleeping problems, as well as severe mental and emotional distress.

136.  Defendant's actions damaged Ms. Wright by causing severe emotional distress.

### **Damages**

137.  Previous paragraphs adopted by reference.

138.  As a proximate cause and/or a consequence of defendants' conduct and actions, JW suffered actual and/or consequential damages as follows: emotional distress and/or loss of hedonic value of life, public humiliation, embarrassment and outrage, mental

anguish, anxiety and mortification, depression, disappointment, and physical manifestations including sleeplessness, loss of appetite and listlessness.

139. Defendants' actions were grossly negligent, made with reckless disregard, and at all relevant times were made with deliberate indifference to plaintiffs' legal and civil rights, and warrant imposition of the greatest possible combination of punitive, emotional distress and exemplary damages, as allowed by law.

<u>**Jury Demand**</u>

Plaintiffs demand a jury trial.

<u>**Relief Requested**</u>

Plaintiffs request this honorable court grant them the following relief:

a.       a minimum of $75,000 damages, to a maximum as warranted by the proofs;

b.       costs, pre- and post-judgment interest and attorney fees;

c.       any other relief as is just and allowed by law, including but not limited to equitable,   injunctive and declaratory relief permitted under the ADA, PDCRA, and Section 504 of the Rehabilitative Act of 1973.


                                                    Respectfully submitted,
                                                    NACHT, ROUMEL, SALVATORE,
                                                    BLANCHARD & WALKER, P.C.


                                                    *s/ Nicholas Roumel*
March 31, 2014                                      Nicholas Roumel, Attorney for Plaintiffs

**VERIFICATION OF PLAINTIFF JW'S NEXT FRIEND**

I state and declare under penalty of perjury that the information in this complaint is true to the best of my knowledge, information, and belief.


February 11, 2014                                       _/s Maryellen Wright_____
                                                                        Maryellen Wright